STATE v. WILL CLONINGER, JOHN CLONINGER and C. W.
COSTNER.

(Filed 22 December, 1908).

**1. Appeal and Error—Instructions—Stating Contentions.**

An exception, that the trial Judge narrated facts not found in
the evidence is untenable, when it appears that he was stating
the contention of a party to the suit supported by the evidence.

**2. Murder—Character Witness—Instructions—Weight of Evidence.**

Upon a trial for a felony, the Judge charged the jury: "You
should likewise consider the evidence as to the character of the
(defendant's) witnesses, whether that evidence was elicited from
the witnesses themselves, on cross-examination, or otherwise, or
whether it was told by witnesses who were called to testify as
to the character of the other witnesses." *Held*, no error, when,
immediately following he instructed the jury, in effect, that such
evidence only went to the weight and credibility of the testimony
in each instance.

**3. Same—Defendant a Witness.**

When a defendant on trial for a felony goes upon the stand in
his own behalf without offering evidence as to his own character,
the credibility of his testimony is in question, and the State may
introduce evidence tending to show his bad character when it is
confined to the purpose of contradiction, or of impeaching his
evidence.

**4. Murder — Defendant a Witness — Character — Substantive Evidence.**

Evidence as to the character of defendant on trial for murder
is substantive, when he goes upon the witness stand and introduces evidence of his good character.

**5. Character Witnesses—Defendant a Witness—Examination.**

For the sole purpose of contradicting his testimony, it is competent for the State to cross-examine a defendant, a witness in
his own behalf, on trial for murder, when he has introduced no
evidence as to his character; and the cross-examination is not
restricted to matters brought out on the direct examination.
Revisal, sec. 1634.

**6. Murder—Insanity—Presumption—Burden of Proof.**

The presumption is that a prisoner on trial for murder was
sane at the time of the homicidal act, with the burden on him to
prove the contrary.

7. **Same—Evidence—Instructions.**

Under the "transitory homicidal plea," the prisoner, on trial for murder, testified: "I guess I was unconscious . . .. I saw (deceased) coming towards me . . . He said he was going to kill me, I thought he was. I then struck him." This blow was the homicidal act. The following instruction was held no error: "If the prisoner was in a state of mind at the time of the homicidal act to comprehend his relation to others, or, knowing the criminal act, was conscious that he was doing wrong, he was responsible; otherwise, he was not." (*State v. Branner, ante* 559, cited and approved).

8. **Murder—Manslaughter—Aider and Abettor—Evidence Sufficient.**

When one of the prisoners was present at the time deceased was killed, and, with others, followed deceased, cursing him, and got a baseball bat away from him with which another person struck the fatal blow, there is abundant evidence to sustain his conviction of manslaughter as an aider and abettor.

ACTION tried before *Moore, J.,* and a jury, February Term, 1908, of GASTON.

Will Cloninger, John Cloninger, Charles Costner and Tollie Cloninger were indicted for the murder of John Mauney. Tollie Cloninger was acquitted. The others were each convicted of manslaughter and sentenced respectively, in the order of their names as above, to three, two and one year each on the public roads, and appealed.

There was evidence that John Mauney was struck in the head with a base-ball bat in the hands of Will Cloninger, one of the prisoners, on 3 August, 1907; that the blow caused his death, and that John Cloninger and Charles Costner aided and abetted in the killing.

There had been a ball game near Hardin, and the game was over. When Mauney received the fatal blow he had backed off the ball ground into a pea field. John Cloninger, Will Cloninger and Charles Costner, the prisoners, followed him into a pea field. In pursuing him the following transpired: John Mauney was backing and waving his bat through the ball ground, telling the crowd (the prisoners in

the crowd) not to follow him. He backed twenty-five steps. Mauney was angry and talking loud, and seemed to be drinking. John Cloninger was facing Mauney and struck at him with his mandolin, and Mauney struck at John Cloninger with his fist once or twice. The Cloninger boys and Costner were in front of Mauney, Mauney backing. Mauney started to fall, and Costner jerked the bat out of his hand. Mauney got down and John Cloninger and Will Cloninger were on him, and Will Mauney pulled them off. Mauney got up, backed into Make Poole's arms, and John Cloninger grabbed him, and Will Cloninger hit him in the head with a bat and knocked him down, and John kicked him in the side. In backing, Mauney was saying: "Men, stand off of me." Will Cloninger, John Cloninger and Charles Costner were in front of Mauney (all three related). He backed and they followed him. Costner wrung the bat out of his hand. Charles Hester hit Will Cloninger with a base-ball bat when they were backing Mauney. It was a bat that he took from Clifton Knight. John Mauney backed; John Cloninger went towards him with mandolin. Costner was told not to follow Mauney; he cursed and said: "Let him put down that bat." Will and John Cloninger got hold of Mauney, and Costner took the bat away. They got Mauney down, and John Cloninger was pulled off of him. Mauney backed, and John Cloninger followed him; they were knocking; Mauney stumbled and fell. Will Cloninger ran up and struck him in the head—the fatal blow. John Cloninger kicked him several times on the ground.

1. As to evidence against Will Cloninger: He struck the fatal blow with a base-ball bat when Mauney was unarmed and down, and being held by Make Pool.

2. As to evidence against John Cloninger: He was knocking Mauney in a willing fight, and aided Will Cloninger by holding Mauney, who was unarmed, while Will Cloninger

knocked him down with a base-ball bat, and then he kicked Mauney when he was down.

3. As to the evidence against Charles Costner: Costner followed Mauney with the Cloningers, he (Mauney) saying: "Men, stand off of me"; jerked and wrung the bat out of Mauney's hand, and then Will Cloninger got the bat from Costner and knocked Mauney down with it. Costner cursed Mauney and said: "Let him put down that bat," and took the bat from him, when John and Will Cloninger had hold of Mauney, and then let Will Cloninger have the bat to hit the fatal blow. The character of the defendants was shown to be that of desperate, lawless men.

(1) Will Cloninger was drinking the day of the homicide; had been indicted three times; twice for fighting with deadly weapons, and once for retailing.

(2) John Cloninger had been indicted several times for fighting, and was then under indictment for retailing.

(3) Charles Costner had been indicted for fighting with a deadly weapon; indicted for retailing and distilling in Federal Court.

Reputation of Charles Costner year or so before homicide, "bad for selling liquor."

Reputation Will Cloninger, "regular blind tiger." All the boys were dealers in liquor except Tollie.

*Assistant Attorney-General Hayden Clement* and *Heriot Clarkson* for State.

*Burwell & Cansler* and *S. J. Durham* for defendants.

CLARK, C. J. The prisoner's brief does not rely on the first three exceptions. The fourth exception is that his Honor narrated facts not found in the evidence, but an examination of the record shows that the Court was stating the contentions of the State, and there was evidence in their support.

The prisoner's exceptions 5 and 6 are to the following instruction: "You should likewise consider the evidence as to the character of the witnesses, whether that evidence was elicited from the witnesses themselves on cross-examination or otherwise, or whether it was told by witnesses who were called to testify as to the character of the other witnesses." Read in connection with that part of the charge which directly follows it, there was no error: "Evidence as to the character of a witness, who is not a defendant, is competent only for the purpose of enabling the jury to place the proper estimate upon the value of the testimony of the witness whose character is under consideration. . . . It is for the jury to say in such case whether the witness told the truth or not; but it is competent to introduce evidence as to the character of a witness in order that the jury may know the character of a witness whose testimony they are considering, and to be thereby aided in determining the weight which is to be given the testimony of such witness."

The seventh exception is to his Honor's charge, as follows: "Evidence as to the character of a witness who is likewise a defendant is competent for two purposes: (1) to enable the jury to place the proper estimate on the testimony of the defendant who is testifying as a witness; (2) as substantive evidence upon the question of guilt or innocence." This part of the charge, when applied to the facts in the case, is correct. Where a defendant goes on the witness stand and testifies, he does not thereby put his character in issue, but only puts his testimony in issue, and the State may introduce evidence tending to show the bad character of the witness solely for the purpose of contradicting him. This is the rule laid down in *State v. Traylor,* 121 N. C., 674, and *State v. Foster,* 130 N. C., 676. But when a defendant introduces evidence himself to prove his good character, then that evidence is substantive evidence, and may be considered by the jury as such.

The defendants, Will Cloninger and Charles Costner, put their characters in issue by examining witnesses to prove their good character. John Cloninger did not do this, nor ever did the State put on evidence to show his bad character, nor for the purpose of contradicting his testimony. The State merely cross-examined him, as it had a right to do, under Revisal 1634. The accused, by becoming a witness in his own behalf, is liable to cross-examination to impair his credit, like any other witness, and the cross-examination is not restricted to matters brought out on the direct examination. The eighth exception is a repetition of the fifth and sixth.

Exceptions 9, 10, 11 and 12 present the "transitory homicidal plea" as to Will Cloninger. The presumption is that he was sane. The burden was on him to show the contrary. *State v. Potts,* 100 N. C., 465. Will Cloninger testified: "I guess I was unconscious.   .   .   .   I saw Mauney coming towards me, he said he was going to kill me, and I thought he was.   I then struck him." His Honor charged: "If the person at the time of the homicidal act was in a state of mind to comprehend his relation to others, or, knowing the criminal character of the act, was conscious that he was doing wrong, he was responsible; otherwise he was not, and such would be your verdict." This charge follows *State v. Haywood,* 61 N. C., 376, which has been approved since on this point. *State v. Potts,* 100 N. C., 465; *State v. Davis,* 109 N. C., 784; *State v. Branner, ante,* 559, and in other cases.

Exceptions 13, 15 and 16. John Cloninger and Charles Costner were aiders and abettors. There is abundant evidence to sustain a conviction where the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection. Presence alone may be regarded as encouraging. *State v. Jarrell,* 141 N. C., 725. To like effect is *State v. Finley and Jimmerson,* 118 N. C., 1161 to 1176, where the Court sustained a conviction of murder in the second degree against the two de-

fendants when it appeared that they were "deviling" the deceased and teasing him, and that one of them struck him and killed him. The Court in that case held that the other was just as guilty, inasmuch as "deviling" and "teasing" was an unlawful act.

Here the prisoners are more guilty, for they were making an assault on the deceased, driving him backwards into a pea field. He repeatedly warned them to stand back and they, with oaths, kept pressing on him. Charles Costner not only lent his presence, but was the man that was endeavoring to take the bat away from him, cursing and telling deceased to give up the bat, and finally jerking the bat out of deceased's hands. As soon as he jerked the bat out of deceased's hands, Will Cloninger took the bat and hit him.

Exceptions 14 and 17 have been considered in the other exceptions. Exception 18 is abandoned, not being in the brief.

This was an important trial. It was a trial of a crowd of disorderly rioters at a baseball game. The painstaking Judge, as appears from the charge, very jealously guarded the rights of the prisoners, giving them many instructions which they asked and some to which they were not entitled. They have had every benefit and advantage of a fair trial.

Indeed, the prisoners have cause to congratulate themselves that they were not tried before a sterner Judge, for Charles Costner, the man who disarmed deceased at the time he was in need of a weapon, only received a sentence of one year's imprisonment; John Cloninger, the man who provoked the difficulty by hitting at deceased with a mandolin, the man who held deceased while his brother struck the fatal blow, and who kicked the deceased after he had been stricken, only received two years' imprisonment; Will Cloninger, the prisoner, who entered the difficulty voluntarily and thereupon became the principal actor, and who finally struck the fatal

blow by leaning over his brother's shoulder, hitting deceased, an unarmed man, who was then in the grip of two other men, in the head with a baseball bat, thereby producing death, only received three years' imprisonment.

No error.

HOKE, J., concurring: I concur in the disposition of this case for the reason that the charge of the Court below on the testimony as to character, where one is both witness and defendant, is to be referred, by fair intendment, to those defendants who had introduced evidence as to their character, and should therefore not be construed as applying to the case of John Cloninger at all; certainly there is such doubt about it that the question should be resolved in favor of the validity of the trial. The verdict of guilty has been rendered by an intelligent jury under the supervision of a learned, just and impartial Judge, and should not be disturbed unless error is clearly shown.

CONNOR, J., dissenting: If I understood the testimony in this appeal, as stated in the opinion of the Court, I would concur in the conclusion of the majority. While usually a dissent is based upon a difference of opinion as to the law, upon the facts stated in the opinion, I could not justify my views in this case without setting out from the record a portion of the testimony. The homicide for which the defendants are convicted occurred in an affray at a game of baseball, and but few of the essential elements of the transaction are stated in the same way by any two witnesses. All concur, however, in the statement that the difficulty was begun by the deceased. The first witness for the State says: "When Will Cloninger struck Mauney, he was standing still and nobody had hold of him." Another State's witness, Garrison, said: "John Cloninger did not start at John Mauney with the mandolin, nor did John Mauney strike at John Cloninger with his fist." The only testimony which has the slightest sem-

blance of John Cloninger's holding Mauney, was that of Grady, who said: "John Cloninger grabbed Mauney and Will Cloninger struck over John Cloninger's shoulder." There was much conflicting evidence in other respects, but none, except that quoted, tending to sustain the statement that John Cloninger held Mauney when he was struck. All of the evidence shows that Will Cloninger had been dealt a deadly blow immediately before he struck—that blood was streaming down his face. There was evidence that he was not conscious at the moment he struck. Tollie was indicted with the other defendants, and acquitted by the jury, evidently because they believed his testimony. He gave the following account of the entire transaction: "John Mauney came through the crowd cursing and waving a bat backwards and forwards; the crowd was making a path in front of him. I told Charles Costner, there goes John Mauney with a bat; Charlie said: 'I am a friend of his and I believe I can get him to put it down.' Charlie walked up to him and told him to put down the bat. Mauney told him not to come on or he would kill him. I told him not to hit Charlie; he then struck at me, and Charles Costner knocked the lick off. Mauney looked like he was going to hit Charlie, and Will Cloninger walked in and told him not to do that. Mauney then cursed Will Cloninger and hit him. Will fell to the ground on his hands and knees; John Mauney started to hit Will again, and John Cloninger ran and grabbed him and they went to the ground; they stayed on the ground about one-half a minute, and it looked like the three rose about the same time. John Mauney then knocked John Cloninger back in the direction of Will Cloninger; and when he knocked John off I understood him to say as he went on towards Will Cloninger: 'Damn you, I will kill you.' He was near to Will, and Will raised up the bat and struck him. I then helped Will in the buggy, after I had stood there a little bit. Will was bleeding all down over his shirt and face. I have known John Mauney

for ten years; his general reputation as a dangerous and violent man, when drinking, was bad. When John Cloninger and John Mauney went down to the ground, John Mauney had the bat; he dropped the bat and John Cloninger picked it up. I had not seen John Cloninger that day until he grabbed Mauney. John Cloninger had no weapon and did not say a word. John Cloninger did not kick Mauney when he (Mauney) was on the ground after Will Cloninger had struck him."

John Cloninger testified: "The first time that I saw my brother, Will Cloninger, that day since the morning, was when he was knocked down by John Mauney. I had been up at the ball ground about ten minutes when Will was knocked down by Mauney; I saw John when he knocked Will down, he started to hit Will again, when I ran in and grabbed him, we went down on the ground together; we came back up and he was knocking me off from him. I saw Will Cloninger standing on the right-hand side of John Mauney. Will then hit him with the bat. I did not kick John Mauney after he was struck by Will. My purpose in running into John Mauney was to prevent him from hitting Will again. John Mauney and I had been good friends. I did not have any conversation with Charles Costner, Will Cloninger or Tollie Cloninger. I have been indicted several times for fighting; I have also been indicted for selling liquor, but never tried; I have been up for being drunk before the mayor of Bessemer. I did not see Charles Costner when this trouble took place. I walked up close to Tollie Cloninger."

No witness testified as to John Cloninger's general character. The only testimony in regard to him in that respect came from his cross-examination. I do not quote the testimony for the purpose of criticizing the verdict of the jury, or the judgment of his Honor, but to show that the case was one in which any error in the charge of the Court may well have controlled the verdict. It was, upon the evidence, a

strongly contested case, and the jury must have found it difficult to reconcile much of the testimony with the guilt of John Cloninger. It was one of those doubtful cases in which evidence of character and the manner in which it was submitted to the jury was of much weight. His Honor's entire charge on the question of character is in the following words: "You should likewise consider the evidence as to the character of the witnesses; whether that evidence was elicited from the witnesses themselves on cross-examination, or otherwise; or whether it was told by witnesses who were called to testify as to the character of other witnesses. Evidence as to the character of a witness, who is not a defendant, is competent only for the purpose of enabling the jury to place the proper estimate upon the value of the testimony of the witness whose character is under consideration. That is, a man of bad character may tell the truth and a man of good character may not tell the truth. It is for the jury to say, in each case, whether the witness had told the truth or not; but it is competent to introduce evidence as to the character of a witness whose testimony they are considering, and to be aided in determining the weight which is to be given the testimony of such witness. Evidence as to the character of a witness, who is likewise a defendant, is competent for two purposes: First, to enable the jury to place a proper estimate upon the value of the testimony of the defendant who is testifying as a witness; second, as substantive evidence upon the question of guilt or innocence. It is competent for one who is charged with a crime to show that his character is good, if he can do so, whether he goes upon the stand as a witness or not; and it is the duty of the jury to consider evidence as to the character of the defendant as substantive evidence upon the main question of guilt or innocence."

It is evident that his Honor intended, as he clearly did, to call the attention of the jury to the different aspects in which the testimony in regard to the character of witnesses and that

149—37

of the defendants should be considered by them. In this he was correct; but he, inadvertently, as I think, fell into error in saying to the jury that they should consider evidence of character whether elicited from the witnesses themselves on cross-examination, or otherwise—and applying this rule to the defendant, John Cloninger, as "substantive evidence upon the question of guilt or innocence." This Court, without dissent, held in *State v. Traylor,* 121 N. C., 674: "When in the trial of a criminal action, the defendant testifies in his own behalf and introduces no evidence as to his general character, but the State introduces evidence to show that such character is bad, such evidence by the State can be considered only as affecting the credibility of the witness, and not as a circumstance in determining the question of his guilt or innocence." This was the sole point presented and decided; a new trial was granted because his Honor refused to tell the jury that evidence of the defendant's character "could not be allowed to affect the question of his guilt or innocence, but only his credibility as a witness." Instead of giving this instruction, his Honor told the jury that the evidence offered by the State of defendant's bad character could properly be considered by them in determining the question of the guilt, or innocence, of the defendant. This was assigned for error, and this Court unanimously held the assignment good. In that case defendant was charged with forgery and the evidence of his bad character, under our decisions, included his moral character, and it not confined to his character for truth. *State v. Efler,* 85 N. C., 585; *State v. Boswell,* 13 N. C., 209. The ruling of his Honor, in that case, had very much more, in reason, to support it than here. It may well have been argued that the jury should more readily conclude that a man of bad moral character would commit forgery than one of good moral character, but here, even if there had been such evidence, it by no means follows that a man charged with manslaughter, a crime the essential elements of which exclude premeditation or malice, should be convicted because

he was once indicted for selling liquor but never tried, and several times for fighting, or that such facts should be cast into the scale against him. *Traylor's case* has been cited and considered as the controlling authority upon this question. In *Foster's case,* 130 N. C., 666, cited in the opinion, this Court, without any exception, having been made *ex mero motu,* said that to permit a witness called to prove the bad character of the prisoner charged with murder to say "that he had the reputation of being 'a little fussy,' " was error, the Court saying: "As the prisoner had gone on the witness stand in his own behalf, it was competent to prove his general character for truth. But the witness testified that he had the reputation of being 'a little fussy.' This evidence was incompetent as the prisoner had not put his character in evidence," citing *Traylor's case.* The law is clearly so stated in *Marcom v. Adams,* 122 N. C., 222. There is not a case cited or to be found in our reports and, I doubt not, in any other court, in which the contrary is held. No one suggests that John Cloninger struck the blow. There is evidence that he was aiding and abetting, and that he kicked Mauney after he was down, but there is also equally as strong evidence that he did neither. Of course, this presented a question for the jury, but they should not have been practically told that they could consider the facts brought out on his cross-examination, having no connection with or relation to this transaction, as substantive evidence of his guilt, unless we are to overrule *Traylor's case.* Certainly, the charge finds no support there, although cited to support the conclusion. I submit that the evidence does not sustain the statement made in the brief of the Attorney-General, copied in the opinion, that John Cloninger "was knocking Mauney in a willing fight, and aided Will Cloninger by holding Mauney, who was unarmed, while Will Cloninger knocked him down with a baseball bat, and then he kicked Mauney when he was down." A perusal of the evidence, I submit, fails to sustain such a conclusion.

John Cloninger may be guilty, but he certainly did not do these things, or, at least, the evidence falls far short of showing it.   The other defendants introduced evidence of their good character and, upon the cross-examination of such witnesses, they said that several of the defendants had been indicted for selling liquor and fighting.   Whatever may be said of the charge as to these defendants, it was manifestly error as to John Cloninger.   There were a number of other exceptions taken on the trial, some of which I think have merit. I do not care to discuss them.

The error, as I view it, as to John, is so manifest and so prejudicial that I have deemed it my duty to say this much. No one can read the entire evidence without being impressed with the fact that a lot of men, employed in harmless sport, were drawn into a fight by the unwarranted interference of the deceased.   One witness says: "I saw John Mauney walking through the crowd waving his bat; he looked like he was mad.   His general reputation as a violent, dangerous man when drinking, was bad."   Another witness says: "Mauney came through the crowd cursing and saying 'stand off me.' He looked as if he had been drinking.   I looked around, and when I looked back, I saw five or six men go down."   Etta Gray, a State's witness, says: "I saw blood on Will Cloninger's hands when he hit John Mauney.   I didn't see any difficulty between John Mauney and John Cloninger.   *Nobody was holding Mauney when he was hit."*   Hovis, for the State, says: "No one was holding Mauney when he was struck." The evidence on this point was contradictory.   I am sure that the learned, just and conscientious judge who, while engaged in the discharge of his duty has passed away, inadvertently fell into what I submit was an error.   I am equally sure that, if living, no one would be more desirous that the error should be corrected.   He was an able, learned judge and a just man.   I have known none more so.

WALKER, J., concurs in dissenting opinion of *Connor, J.*