STATE OF NORTH CAROLINA v. BEN FRANK SCOTT AND EULA MAE JACOBS

No. 61

(Filed 14 May 1976)

**1. Criminal Law § 9; Homicide § 21 —presence at scene and friendship with perpetrator — insufficient evidence of aiding and abetting**

The State's evidence was insufficient to be submitted to the jury on the issue of the male defendant's guilt of aiding and abetting the

State v. Scott

femme defendant in the murder of her husband where it tended to
show only that the male defendant was a friend of the actual perpetra-
tor, he was present at the time and place the crime was committed,
and he provided post-crime assistance to the actual perpetrator, and
there was no evidence of acts of assistance by the male defendant
during commission of the crime and no direct evidence of the crime
scene itself which would permit an inference that the male defendant
had knowledge that his presence would be regarded by the perpetrator
as encouragement.

2. **Criminal Law § 116— defendant's failure to offer evidence — incom-
plete instruction**

The trial court committed prejudicial error in instructing the
jury that defendant elected, as he had the right to do, not to offer
evidence without further instructing the jury that defendant's failure
to testify should not be considered as a circumstance against him.

Justice HUSKINS dissenting.

Justice COPELAND concurs in that portion of the dissent relating
to the charge of the court.

STATE'S appeal pursuant to General Statute 7A-30(2) and
defendant Scott's petition for discretionary review under Gen-
eral Statute 7A-31(c)(3) of the decision of the Court of Ap-
peals, reported at 26 N.C. App. 145, 215 S.E. 2d 409 (1975),
(Parker, J., dissenting) awarding a new trial to each defend-
ant. This case was docketed and argued as No. 41 at the Fall
Term 1975.

Defendants were separately indicted for the first degree
murder on June 19, 1974, of Wallace Jacobs, husband of the
femme defendant. After a joint trial upon the indictments the
jury found each defendant guilty of murder in the second de-
gree. Each was sentenced to 25-30 years imprisonment. The
facts are fully set out in the opinion.

*Rufus L. Edmisten, Attorney General, by James E. Magner,
Jr., Assistant Attorney General, for the State.*

*I. M. Biggs, for defendant Ben Frank Scott.*

*Musselwhite, Musselwhite & McIntyre, by Fred L. Mussel-
white, for defendant Eula Mae Jacobs.*

EXUM, Justice.

Our decision upon defendant Scott's petition for further
discretionary review is to reverse the Court of Appeals insofar
as it affirmed the denial of this defendant's motion for nonsuit.

Upon the State's appeal we affirm the Court of Appeals' award of a new trial to defendant Jacobs.

The evidence for the State, neither defendant having offered evidence, may be summarized as follows:

Eula Mae Jacobs and Wallace Jacobs apparently did not have a peaceful marriage. On occasion he had beaten her. A week before the killing she had taken out a warrant against him. Many times in the past she had expressed an intent to kill him. She owned a .22 caliber pistol which she had practiced firing and also had recently purchased a box of .22 caliber bullets. On June 16, 1974, her practice firing was accompanied by a statement of intent to kill her husband. Most of this evidence was admitted only against defendant Eula Mae Jacobs but its repetition is necessary to understand the case against Ben Scott.

The evidence adduced by the State against Ben Scott may be summarized as follows:

Before his marriage to Andella Scott and before his imprisonment on other charges Ben Scott was a frequent visitor in the home of Wallace and Eula Mae Jacobs. Andella Scott was Eula Mae's niece. Ben Scott had been separated from his wife Andella for several months while he was in prison but on work release. During this period Ben Scott stated, with reference to no one in particular, that "if he discovered his wife was having an affair with another man, that he would take the lives of both of them." Andella Scott visited often at the home of Wallace and Eula Mae Jacobs, usually when Eula Mae was present. As Eula Mae did not drive, Wallace Jacobs would usually bring Andella Scott to the Jacobs home and return her. There was testimony that Eula Mae might have tried to get Andella Scott to return to Ben. Before going to prison Ben Scott had once forbidden his wife to visit at the Jacobs home. While on work release, however, he would sometimes visit the Jacobs.

In early June, 1974, Ben Scott was released from prison and began visiting the Jacobs home regularly. One witness testified, "After the 1st day of June, I saw [his car] over there almost daily. He would sometimes get there about 9:00-10:00 o'clock and he would stay over in the evening. I know that Wallace Jacobs was at work while this was going on."

One week before the killing Andella Scott went to the Jacobs home while Ben was there. He unsuccessfully attempted a reconciliation, became angry and left.

On June 17, 1974, Ben Scott drove Eula Mae Jacobs to the home of Anderson Locklear in Cumberland Mills. Eula Mae fired her .22 caliber pistol three or four times after getting out of the car. Apparently Wallace Jacobs had just beaten Eula Mae again. Ben Scott stayed just long enough for Anderson Locklear to get Eula Mae's beer cooler out of Scott's car. Locklear noticed two "long guns" in the back seat of the car. Scott left.

On June 18, 1974, at 2:00 p.m. Dorothy Locklear, a close neighbor of the Jacobs, saw Ben Scott's car at the Jacobs residence. Dorothy Locklear was taking clothes off the line and Eula Mae Jacobs was hanging out clothes. Dorothy Locklear testified, "After she got through hanging hers out, Ben Frank Scott and Eula Mae Jacobs went running and playing and fell down in the grass at the back of the house. They grabbed each other and fell down on the grass." Ben Scott's car stayed there all afternoon. All that day from 9:00 or 9:30 a.m. until 4:30 p.m. Lefty Cummings, Eula Mae Jacobs' son who worked a night shift, was sleeping in the Jacobs house. When Lefty woke up at 4:30 p.m. Wallace and Eula Mae were both there. Wallace usually got off work at 4:30 p.m. Lefty went back to bed at 6:00 p.m. after supper. In his pajama drawer he noticed his mother's .22 caliber pistol. Later during the night Ben Scott came into Lefty's bedroom, woke him up and told him that his mother said for him to get up and get ready for work. Lefty left at 11:10 p.m., leaving Ben Scott sitting in a chair, Eula Mae Jacobs lying on a sofa, and Wallace Jacobs sitting in a rocking chair.

At 12:00 midnight Dorothy Locklear, the neighbor, heard five shots but did not get out of bed or look out the window.

At 12:35 a.m. on June 19, 1974, Eula Mae Jacobs and Ben Scott arrived at the Anderson Locklear home in Cumberland Mills. (Driving time by the most direct route from the Jacobs home to Anderson Locklear's is 35-40 minutes at the speed limit.) Ben Scott said, "Give me them things you got." Eula Mae handed him six or seven cartridges from her pocketbook. Ben Scott said "What about my gas?" Eula Mae gave him two dollar bills and some change. Eula Mae told Scott to take a message to her son Lefty not to go home after work but to

go to his Aunt Ida's and to give Lefty the phone number of of Mr. and Mrs. Rich, the next door neighbors of the Anderson Locklears where the Locklears received telephone calls. Scott left.

At about 2:00 or 2:15 a.m. Ben Scott appeared at the textile plant where Lefty Cummings was working and gave him Eula Mae Jacobs' message. (Driving time from the Anderson Locklear home to the plant where Lefty worked was approximately 45 minutes.)

At 2:45 a.m. a night operator for Southern Bell in Laurinburg received a telephone call from a pay telephone in Lumberton. (Driving time from the plant where Lefty worked to Lumberton is 40-45 minutes.) A male voice told her to ring the Sheriff's office and tell him to go to an address in Pembroke where they would probably find a dead man. The operator could not remember the address. The caller would not stay on the line while the operator rung the Sheriff.

At 3:09 a.m. Ben Scott was seen in a pay telephone booth in Lumberton with the receiver at his ear. At 3:10 a.m. the dispatcher at the Robeson County Sheriff's Department received a telephone call from an unidentified male. The caller said, "I got something I want to tell you. Listen to what I got to tell you. I'm only going to say it one time . . . . Go to Wallace Jacobs' residence in the Pembroke area, there's been a break-in at that house and you will find the lights out in the house and the doors locked. There will be a screen torn out in one of the back windows and there is someone hurt." The dispatcher asked him how he knew. The caller said, "Never mind. Just take my word." When the dispatcher asked who was calling the caller hung up.

At 3:30 a.m. Sheriff's Deputies Honeycutt and Locklear arrived at the Jacobs residence. One window screen, bent from the inside out, was found on the grass. The window was raised. They entered the house and found Wallace Jacobs nude and dead from two gunshot wounds of undetermined caliber. At 4:15 a.m. Deputy Sheriff Stone arrived. Several bullet holes were found in the house and one spent .22 caliber bullet. A box of .22 caliber bullets was found in what was apparently Eula Mae's bedroom. Although an air rifle was lying on the deceased's arm and there was a box of pellets in the deceased's left hand there was no blood on the rifle or pellet box. The deceased's left palm was bloody.

At 6:00 a.m. Lefty Cummings returned from work. The .22 caliber pistol was no longer in his drawer.

Between 11:00 and 11:30 a.m. that morning of June 19, 1974, Ben Scott came to the Anderson Locklear home. Annie Jane Locklear asked if he knew Wallace Jacobs was dead. He said "No" and "the last time he seed him was setting in the chair with his feet on the hassock." Annie persisted, "Who killed him?" Ben Scott said, "I don't know." Annie asked about his wife, and Ben Scott said "Andella would call Aunt Eula and make an appointment to go over and Wallace would pick her up and Wallace would take her home; that they were too close."

Around noon on June 19 Ben Scott and Eula Mae Jacobs were both in the Anderson Locklear home. While asking Eula Mae about her husband's death, Annie Jane Locklear mentioned lawyers. Ben Scott then said to Eula Mae Jacobs, "Come on, I will carry you to the lawyer's office." He helped her to the car and they left.

Ben Scott was arrested on June 20. While in custody he was visited by Eula Mae Jacobs' daughter, Connie Cummings. She asked him whether he killed Wallace. He said, "No, I didn't." She then inquired whether he had been at Wallace Jacobs' house at 2:00 a.m. on June 19. After first denying it he said, "Oh, yes, I did go over there, too."

Two gloves were found in Scott's car the day of his arrest. There were no fingerprints on the window screen of Jacobs' house. Scott's explanation for the gloves was that he worked in a chicken plant. The gloves had no blood or foreign substance on them.

I

In our opinion the evidence is insuffcient to withstand defendant Scott's motion for nonsuit. The rules for determining the sufficiency of evidence when such a motion is lodged were recently restated in *State v. Hankerson*, 288 N.C. 632, 636, 220 S.E. 2d 575, 580 (1975): "[W]e consider all of the evidence actually admitted . . . in the light most favorable to the State, resolve any contradictions and discrepancies therein in the State's favor, and give the State the benefit of all reasonable inferences from the evidence."

State v. Scott

Viewing the evidence in this light the jury could reasonably infer that Eula Mae Jacobs intended to kill her husband, made preparations to do so, harbored both longstanding and fresh grievances against him, and, so motivated, actually shot him to death. As to defendant Scott the evidence is far less convincing. For instance it leaves to speculation and conjecture whether Scott had any motive for killing Wallace Jacobs. He might, of course, have been jealous because of the "too close" relationship between Wallace Jacobs and his estranged wife, Andella Scott, or he might have desired Eula Mae Jacobs. There was, however, no direct testimony that he was either jealous or desirous and no circumstantial evidence from which either motive could be reasonably inferred. The two supposed motives are, in a real sense, mutually exclusive and, in view of the ages (from the warrants it appears that Scott was 26 and Eula Mae was 45) and relationships of the parties, somewhat improbable.

There is direct testimony that Scott was present with Wallace and Eula Mae Jacobs at their home 40 minutes before shots were heard and that 35 minutes later he was observed to arrive by automobile with Eula Mae Jacobs at a place some 35 minutes driving time away from the scene of the crime. The evidence supports, therefore, a reasonable inference that Scott was present at the time and place of the crime.

As was stated in *State v. Cutler*, 271 N.C. 379, 383, 156 S.E. 2d 679, 681-682 (1967) :

"The question for the Court is whether, when all of the evidence is so considered, there is substantial evidence to support a finding both that an offense charged in the bill of indictment . . . has been committed and that the defendant committed it. *State v. Bass*, 253 N.C. 318, 116 S.E. 2d 772 [1960]. If, when the evidence is so considered, it is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion for nonsuit should be allowed. *State v. Guffey*, 252 N.C. 60, 112 S.E. 2d 734 [1960]. This is true even though the suspicion so aroused by the evidence is strong. *State v. Chavis*, 270 N.C. 306, 154 S.E. 2d 340 [1967].

\* \* \*

"These controlling principles of law are more easily stated than applied to the evidence in a particular case. Of

necessity, the application must be made to the evidence introduced in each case, as a whole, and adjudications in prior cases are rarely controlling as the evidence differs from case to case."

[1] The case against defendants Scott and Jacobs rests on the theory that one defendant did the shooting and the other was an aider and abettor. The State does not seriously contend that Scott was the actual perpetrator. Indeed the State's evidence was that Scott, when asked by Connie Cummings if he killed Wallace Jacobs said, "No, I didn't." The State is bound by that statement unless other evidence casts doubt on its veracity or throws "a different light on the circumstances of the homicide." *State v. Hankerson, supra.* While there was evidence which cast doubt on Scott's denials of his being present at and having knowledge of the crime, no evidence impinges upon his denial that he killed Wallace Jacobs. The case could not have been submitted to the jury on the theory that he did. Whether there was sufficient evidence to submit the case on the theory that Scott was an aider and abettor of Eula Mae Jacobs is a more difficult question. We hold, however, that the evidence was insufficient on this theory also.

The applicable rules of law were fully set forth in *State v. Rankin*, 284 N.C. 219, 222-223, 200 S.E. 2d 182, 184-185 (1973) in an opinion by Associate Justice Lake:

"'[W]hen two or more persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty.' [Citations omitted.] To be sufficient to sustain a conviction, it is not necessary that the evidence for the State show the defendant struck the blow, seized or carried away the property or spoke any word at the time and place of the offense. [Citations omitted.]

"The mere presence of the defendant at the scene of a crime, even though he is in sympathy with the criminal act and does nothing to prevent its commission, does not make him guilty of the offense. [Citations omitted.] . . . [The elements of this theory are that] defendant was present, actually or constructively, with the intent to aid the perpetrator in the commission of the offense should his assistance become necessary and that such intent was communicated to the actual perpetrator. Such communication of

intent to aid, if needed, does not, however, have to be shown by express words of the defendant, but may be inferred from his actions and from his relation to the actual perpetrator. *'When the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement.'* Wharton, Criminal Law, 12th Ed., § 246." (Further citations omitted.) (Emphasis added.)

The State strenuously contends that *Rankin* stands for the proposition that presence alone at the scene of a crime coupled with the fact of friendship with the actual perpetrator is enough to permit a jury to find the friend guilty on the theory of aiding and abetting. This is not the law and the decision in *Rankin* does not rest upon such a principle. *Rankin* dealt with a prosecution for larceny from the person. Appellant was convicted at trial on the theory of aiding and abetting. The State's evidence was that the victim was walking through an alley when one Crawford snatched her purse. Turning, she saw three persons, Crawford, appellant Rankin, and Speed. Crawford emptied her purse, took the money and told the victim, "You better not come this way." The other two never spoke. The three men ran out of the alley, slowed down as they reached the street and proceeded "as if nothing had happened" to a store where they made a purchase. When the police arrived the three ran from them. This Court held there was sufficient evidence to permit the jury to find that appellant Rankin was "present at the scene of the offense for the purpose of aiding Crawford and that Crawford was aware of such purpose." *Id.* at 224, 200 S.E. 2d at 185. The immediate flight of appellant Rankin with Crawford and Speed was seen as a circumstance to be considered by the jury though not sufficient in itself to withstand the motion for nonsuit.

It is clear that in *Rankin* the Court thought the evidence permitted a reasonable inference that appellant's presence at the scene was "for the purpose of aiding" the actual perpetrator, Crawford. The actions of Crawford and his cohorts after the crime, when added to the facts of their very presence together in an alleyway and their juxtaposition at the time of the offense were sufficient to permit a jury to infer an intent to aid on the part of Rankin and some communication of that intent to Crawford.

The distinction between *Rankin* and the case at bar is this: in *Rankin* there was direct evidence of appellant's presence at the scene, the nature of the scene, how the parties were situated at the scene with relation to each other, plus their common effort immediately after the crime to escape detection. In the case before us this kind of evidence is totally lacking. That defendant Scott was even present at the scene is a fact which must be inferred, if at all, from other circumstances. The scene is not delineated by any direct evidence as it was in *Rankin*. Scott's actions after the crime are, moreover, unlike *Rankin*, *not* an effort to conceal the crime but, rather, an effort to provide post-crime assistance to the actual perpetrator, Eula Mae Jacobs. *Cf. State v. Hargett*, 255 N.C. 412, 121 S.E. 2d 589 (1961).

The case against Scott then comes to this: he was a friend of the actual perpetrator and was present at the time and place the crime was committed. The rule stated in *Rankin* that "when the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement" does not mean that mere presence plus friendship is sufficient evidence for a jury to convict upon an aiding and abetting theory. The rule by its terms requires that the friendly bystander *have knowledge* that his presence will be regarded by the perpetrator as encouragement. *State v. Banks*, 242 N.C. 304, 87 S.E. 2d 558 (1955). When the scene of the crime is described by direct evidence as it was in *Rankin* such knowledge of the bystander may well be inferred from this description. Where, however, as here, presence is proved only by inference and there is no direct evidence of the crime scene itself it would be unreasonable to infer also such knowledge of the bystander from the mere fact of his presence.

This Court has consistently held that a friendly relationship between a bystander and the actual perpetrator of a crime is not enough standing alone to make the bystander an aider and abettor. In *State v. Banks, supra,* we held it error for the trial judge to charge the jury that "mere presence . . . is enough to make one an aider or abettor where both or all of the defendants are friends." In *State v. Ham,* 238 N.C. 94, 98, 76 S.E. 2d 346 (1953) we said, "Yet we find no decision of this Court in which it is held that evidence tending to show that a bystander was a friend of the perpetrator and the perpetrator was aware of his presence, and nothing more, is sufficient to

support a conviction [as an aider and abettor]." *Accord, State v. Hargett, supra.*

In other aiding and abetting cases where the friendliness of the bystander was a circumstance and the case was permitted to go to the jury there was evidence of more than mere presence. There was in each case evidence of acts of assistance during commission of the crime. *State v. Holland,* 234 N.C. 354, 67 S.E. 2d 272 (1951); *State v. Williams,* 225 N.C. 182, 33 S.E. 2d 880 (1945); *State v. Cloninger,* 149 N.C. 567, 63 S.E. 154 (1908); *State v. Jarrell,* 141 N.C. 722, 53 S.E. 127 (1906).

*State v. Ham, supra,* is persuasive authority for nonsuiting the case against defendant Scott. *Ham* was a prosecution against five defendants for murder which occurred when two groups of women engaged in a general brawl. Two of the defendants, Jean Teaster and Leonard Teaster, were husband and wife. The State's evidence was that while Jean Teaster had actively participated in the brawl, Leonard simply stood by, watched the affair, and drove the automobile for the femme defendants. In holding that Leonard Teaster's motion for nonsuit should have been allowed this Court said, *State v. Ham, supra* at 98, 76 S.E. 2d at 349:

> "The defendant Jean Teaster was aware of the presence of her husband, and we may assume that in all probability this defendant would have intervened had it appeared to him that his wife was getting the worst of the encounter. But this is a pure surmise based on our knowledge of human nature and not an inference of fact supported by evidence.

> \*    \*    \*

> The cases cited and relied on by the State are factually distinguishable. In those and like cases *there was evidence of some fact or circumstance tending to establish the defendant's actual participation in the commission of the crime charged.*" (Emphasis added.)

For the reasons stated, we hold that defendant Scott's motion for nonsuit should have been allowed. The decision of the Court of Appeals affirming the denial of this motion must, therefore, be reversed.

## II

**[2]**  Neither defendant called any witnesses or testified in his or her own behalf. After defendants rested the trial judge said:

"All right, members of the jury, the State has rested. The Defendant Scott as he has the right to do, has elected not to offer evidence. The Defendant Jacobs, as she has a right to do, has elected not to offer any evidence. So the next order of the trial is the arguments of counsel."

In his charge to the jury the trial judge, after summarizing the evidence for the State, said:

"The defendant Scott elected, as he had the right to do, not to offer evidence. The defendant Jacobs elected, as she had the right to do, not to offer evidence."

The Court of Appeals awarded a new trial because this instruction was practically identical to the one given in *State v. Baxter,* 285 N.C. 735, 208 S.E. 2d 696 (1974) and found wanting. The State in its brief and Judge Parker in his dissent urge us to reconsider the decision in *Baxter* and hold the instruction, if error, to be harmless beyond a reasonable doubt.

In *Baxter,* the trial judge instructed the jury, "The defendants, Robert Baxter and Alveta Baxter, did not offer any evidence as they have the right to do." This Court pointed out that the statement was ambiguous. It could mean either that the defendant "had the right not to offer any evidence and did not do so; or . . . he had the right to offer evidence and did not do so." The Court held, however, that whichever interpretation was adopted the instruction was prejudicially erroneous in that it was an incomplete statement of the law and did not make "clear to the jury that the defendant has the right to offer or to refrain from offering evidence as he sees fit *and that his failure to testify should not be considered by the jury as basis for any inference adverse to him.*" *State v. Baxter, supra* at 738-739, 208 S.E. 2d at 698. (Emphasis added.)

The statement here does not suffer from the same ambiguity as the statement in *Baxter.* Reasonably interpreted it seems clear that the right referred to by the trial judge in both instances was the right *not* to offer evidence. The trial judge, as in *Baxter,* did not, however, advise the jury that defendant's failure to testify should not create any inference adverse to him. We said in *Baxter* that, absent a request, it is generally better for

the trial judge not to remind the jury of a defendant's failure to testify, a circumstance which is already quite obvious to it. *Baxter* then made it clear that if he does undertake to do so, he must also advise the jury that defendant's failure to testify must not be considered as a circumstance against him. This instruction is essential to insure, insofar as possible, that defendant's exercise of a fundamental right shall not be used by the jury to his prejudice. Failure to give it is, under the circumstances here, prejudicial error.

We note, in fairness to the trial judge here, that *Baxter* was filed on October 10, 1974, just four days before this trial commenced, and had not at the time of trial been generally circulated.

The decision of the Court of Appeals awarding a new trial to the defendant Jacobs is affirmed.

On defendant Scott's petition, REVERSED.

On State's appeal, AFFIRMED.

Justice HUSKINS dissenting.

The majority hold that the evidence in this case was insufficient to support a finding by a jury that defendant Scott aided and abetted defendant Jacobs in murdering her husband and that defendant Scott's motion for nonsuit therefore should have been granted. The majority also hold that the trial judge committed prejudicial error in failing to instruct the jury that defendants' decision not to testify or offer other evidence "should not be considered by the jury as basis for any inference adverse to [them]." *State v. Baxter,* 285 N.C. 735, 208 S.E. 2d 696 (1974). Consequently, defendant Scott's conviction is reversed outright and defendant Jacobs is awarded a new trial. For the reasons which follow, I dissent as to both defendants and vote to uphold their convictions.

The evidence against defendant Scott is accurately stated in the majority opinion. Suffice it to say that, in my opinion, when this evidence is considered in the light most favorable to the State, when any contradictions and discrepancies are resolved in favor of the State, and when the State is given the benefit of all reasonable inferences arising from this evidence, *see State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575 (1975), there is evidence from which a jury could reasonably conclude that

defendant Jacobs shot her husband to death and that defendant Scott aided and abetted her in that act. *See State v. Rankin,* 284 N.C. 219, 200 S.E. 2d 182 (1973).

Defendants offered no evidence. After they rested, the trial judge on his own motion instructed the jury, in part, that "[t]he defendant Scott as he has the right to do, has elected not to offer evidence. The defendant Jacobs, as she has a right to do, has elected not to offer any evidence." The majority, relying on *State v. Baxter, supra,* hold that the trial judge, having given this instruction, committed reversible error in failing to further instruct the jury that defendants' decision not to offer evidence could not be "considered as a circumstance against them." Although this omission was a technical violation of the rule announced in *Baxter,* examination of the instruction given in the present case convinces me that this oversight on the part of the trial judge was harmless beyond a reasonable doubt.

In *Baxter,* the trial judge instructed the jury that "[t]he defendants, [naming them], did not offer any evidence as they have the right to do." The majority in *Baxter* concluded that this statement was ambiguous in that it could mean either that defendant "had the right not to offer any evidence and did not do so; or . . . he had the right to offer evidence and did not do so." In the instant case, however, as the majority concede, "[t]he statement . . . does not suffer from the same ambiguity as the statement in *Baxter.* Reasonably interpreted it seems clear that the right referred to by the trial judge in both instances was the right *not* to offer evidence." For these very reasons, I do not believe that there is a reasonable possibility that the omission complained of might have contributed to the convictions. *Fahy v. Connecticut,* 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963). In all events, when considered in the context in which it was used the incomplete statement had no prejudicial effect on the result of the trial and was therefore harmless. *See State v. Perry,* 231 N.C. 467, 57 S.E. 2d 774 (1950), and my dissent in *State v. Baxter, supra,* at 739.

For the reasons stated above, I dissent from the majority opinion and vote to reverse the Court of Appeals and uphold the conviction of both defendants.

Justice COPELAND concurs in that portion of the dissent relating to the charge of the court.