No. 73,166

STATE OF KANSAS, *Appellee*, v. JOSHUA BRANDON KAISER, *Appellant.*

(918 P.2d 629)

Opinion filed June 7, 1996.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*Michelle V. Hostetler*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Joshua Kaiser appeals from his convictions for first-degree felony murder, aggravated kidnapping, aggravated robbery, and unlawful use of a weapon. Defendant claims (1) insufficiency of evidence; (2) error in jury instructions; (3) juror misconduct; (4) improper certification for prosecution as an adult; and (5) double jeopardy.

Kaiser, who was 17 years old at the time, was charged with aiding and abetting Jason Schaeffer in several offenses culminating in the shooting death of Tim Riley. The facts are largely undisputed and are based primarily on defendant's statements to the police and the testimony of a witness.

Kaiser and Schaeffer were AWOL from a juvenile drug and alcohol treatment facility. During the early morning hours of March 1, 1993, Kaiser and Schaeffer left the house of a friend, T. J. Solis. In his statements to the police, Kaiser admitted that he and Schaeffer, who had an unloaded sawed-off .410 shotgun and two shells, left Solis' house to steal a vehicle. Around 3 a.m. they observed

Tim Riley start his car and then return to his house. Kaiser suggested they steal the car. Because Schaeffer was concerned Riley would call the police to report the car stolen, Schaeffer decided they should wait for Riley to return and take him hostage. As they waited, Kaiser stated, he informed Schaeffer that he did not want to do it. As Kaiser started walking away, Riley came out of the house. Kaiser looked back and heard Schaeffer "cock" the gun and tell Riley that his friend had a .45 pistol. Riley was forced into the driver's seat. As Kaiser continued to walk away, the car pulled up and Schaeffer told him to get into the front seat of the car. Schaeffer forced Riley into the trunk of the car, and Riley asked them to take care of the car.

Solis became aware they had returned to his house when Kaiser threw snowballs against a window. Solis went outside. Kaiser was sitting in the passenger seat of a car, and Schaeffer was in the driver's seat. A shotgun that a friend had left at Solis' house several days earlier was on the back seat. Schaeffer told Solis they had "jacked" a guy. Solis understood that to mean a carjacking. Schaeffer informed Solis that the owner of the car was in the trunk. Because Solis was skeptical, Schaeffer said toward the back of the car, "Are you all right back there, sir?" Solis was surprised by a voice responding from the trunk, "Yeah, I'm all right." Schaeffer told Solis to get into the car, but Solis declined. Schaeffer drove away with Kaiser in the passenger seat and Riley in the trunk.

Five minutes after Schaeffer and Kaiser departed, Solis called the police and spoke to an officer. Solis told the officer that a person was in the trunk of a car. He gave the officer the make of the car and the license number. He informed the officer that Schaeffer and Kaiser would return to his house to pick up clothes that they had left at his house.

After leaving Solis' house, Schaeffer and Kaiser drove to the country. Schaeffer suggested to Kaiser that they kill Riley. Kaiser said he told Schaeffer he was not killing anyone and requested Schaeffer to drop him off and allow him to walk home. Kaiser said he later told Schaeffer not to kill Riley or he would get the hard 40, but Schaeffer ignored him. Schaeffer stopped the car, let Riley out of the trunk, and told Riley to stand near a fence post with his

back to him. Kaiser said he remained in the car with the window open, smoking a cigarette. Schaeffer asked Riley how the ride was, and Riley replied that it was a little bumpy. Schaeffer then shot Riley in the back of the head. After the shooting, Kaiser exited the car and walked to the body. Kaiser observed blood coming from Riley's mouth and head. Schaeffer took Riley's watch and ring. Kaiser indicated he felt sad and was in a daze.

Later, Solis again heard Kaiser throwing snowballs against a window. Solis notified the police by telephone that Schaeffer and Kaiser had returned. Solis met Kaiser at the back door of the house. Kaiser asked for clothes he and Schaeffer had left at the house, and Solis retrieved the clothes. Nothing was said about the man in the trunk of the car. Solis said that either Schaeffer or Kaiser told him that they were leaving for Texas. After Schaeffer and Kaiser drove away, Solis again telephoned the police.

The police located the car and a chase ensued, ending when the car crashed into a tree. After a foot chase, Kaiser and Schaeffer were apprehended hiding in a car several blocks from the scene of the crash. Kaiser gave audiotaped and videotaped statements. Kaiser stated to the police, "It was me or him [Riley], or both of us." Kaiser did not inform the police that they had stopped at Solis' house before taking Riley into the country. Kaiser later admitted that they had stopped at Solis' house after Schaeffer killed Riley. Kaiser indicated to the police that Schaeffer was acting crazy. After giving the statements Kaiser directed the police to a field where Riley's body was found. Riley had died of a single gunshot wound to the back of the head fired from a distance of less than 4 feet.

The State's motion to waive juvenile jurisdiction was granted, and Kaiser was tried as an adult. The jury convicted Kaiser of unlawful use of a weapon, aggravated robbery, aggravated kidnapping, and felony murder based on the underlying crime of aggravated robbery. Kaiser was sentenced to life (murder), life (aggravated kidnapping), 15 years to life (aggravated robbery), and 1 to 5 years (unlawful use of a weapon). All sentences were imposed concurrently except the 15 to life sentence for aggravated robbery. Kaiser appeals.

## SUFFICIENCY OF EVIDENCE

The defendant's first claim is that there was insufficient evidence to support his convictions because the State's evidence was that he was not involved in the crimes, but merely was present, and he was not an aider and abettor. He further claims the conviction was improperly based on speculation, conjecture, and suspicion. Because each claim is based on sufficiency of the evidence, we will analyze each claim separately and then review the evidence.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court's standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994). This court will not reweigh the evidence; rather, it looks only to the evidence which supports the verdict. If the essential elements of the charge are sustained by any competent evidence, the conviction must stand. *State v. Burton*, 235 Kan. 472, Syl. ¶ 2, 681 P.2d 646 (1984).

One of Kaiser's assertions to the jury was that he reasonably believed he would suffer the same fate as Riley if he did not act as Schaeffer demanded. Based on this testimony, the jury was instructed:

"Compulsion is a defense if the defendant acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would have been inflicted upon him had he not acted as he did.

"Such a defense is not available to one who willfully or wantonly placed himself in a situation in which it was probable that he would have been subjected to compulsion or threat."

After reviewing the evidence the jury found that Kaiser was not compelled by Schaeffer and had chosen to associate with Schaeffer in the deadly venture.

### 1. Evidence Contradicting Defendant's Version

The defendant's primary contention is that the State must accept as true his statements which the State introduced into evidence, unless the State affirmatively proves with other evidence an expla-

nation for how the incident occurred. The defendant points out that the State's evidence, *i.e.*, his statements to the police, shows that he was not involved in the crimes of which he was convicted. As authority for his claim that under the circumstances the State was bound by his exculpatory statement, Kaiser cites *State v. Scott*, 289 N.C. 712, 224 S.E.2d 185 (1976).

*Scott* involved a defendant charged in the shooting death of Wallace Jacobs. Jacobs' wife, Eula Mae, was also charged in the shooting. The State did not believe Scott was the shooter and charged him as an aider and abettor of Eula Mae. The State presented Scott's statement, "No, I didn't," when asked whether he killed Jacobs. The *Scott* court stated: "The State is bound by that statement unless other evidence casts doubt on its veracity or throws 'a different light on the circumstances of the homicide.' " 289 N.C. at 719 (quoting *State v. Hankerson*, 288 N.C. 632, 637, 220 S.E.2d 575 [1975]). In *Scott*, there was no evidence impinging upon Scott's denial that he killed Jacobs, so the case could not have been submitted to the jury on the theory that he did. The *Scott* court reviewed the record and found evidence of aiding and abetting insufficient and reversed the conviction. Conversely, the *Hankerson* court found evidence throwing a different light on the circumstances of the homicide sufficient to discount the exculpatory portions of the defendant's confession.

Kaiser, relying on *Scott*, highlights his version of the evidence and asserts that the evidence introduced by the prosecution shows that he only intended to steal an unoccupied car and had refused to associate with Schaeffer's later unlawful activity. He points out that after the attempted thefts of several cars, he refused to participate in the other crimes, sat passively in the stolen car, and tried to persuade Schaeffer to release Riley unharmed.

The defendant cites no Kansas cases to support his assertion that the State is bound by exculpatory statements of a defendant which are introduced at trial by the State. Kaiser's assertion ignores that the jury is to determine the weight and credibility to be given to the testimony of each witness. Thus, even if there was no evidence contrary to Kaiser's denial, the jury could find that his statements excusing his participation in the offenses were not credible or were

entitled to little weight and could disregard those portions of his statements.

Next, the defendant stresses that his mere presence is insufficient to show beyond a reasonable doubt that he knowingly associated with the unlawful venture and participated in a way which indicated willful furtherance of the venture. He cites *State v. Green*, 237 Kan. 146, 697 P.2d 1305 (1985).

In *Green*, the State appealed from the dismissal of a complaint following the preliminary examination. The defendant rode to Lawrence with two friends for the purpose of driving around. They drove by a car dealer's lot and then returned to steal new wheels and tires for the car. While the two friends removed the wheels and tires from a truck in the lot, the defendant drove away because he wanted nothing to do with the theft. Later the defendant returned to pick up his friends. He did not help load the tires into the car. The *Green* court affirmed the district court's refusal to bind the defendant over for trial, stating that the evidence showed the defendant was nothing more than a "mere associate" of the principals and that there was not even circumstantial evidence to show that Green was willfully furthering the success of the criminal venture. 237 Kan. at 149.

Contrary to the findings in *Green*, here there is sufficient other evidence, in addition to the defendant's statements, presented at trial to cast doubt on the defendant's claim that he was merely present when the crimes were committed.

## 2. Aiding and Abetting

The defendant also argues that the fact he intended to steal an unoccupied car does not translate into an intent to commit the crimes of aggravated robbery, aggravated kidnapping, and murder.

K.S.A. 21-3205 sets forth the statutory liability for aiding and abetting:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by

such person as a probable consequence of committing or attempting to commit the crime intended."

The jury was instructed on this theory of liability.

To be convicted as an aider and abettor, "the law requires that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture." *State v. Hobson*, 234 Kan. 133, 138, 671 P.2d 1365 (1983). Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates with the unlawful venture and participates in a way which indicates he or she willfully is furthering the success of' the venture, such evidence of guilt is sufficient to go to the jury. *State v. Dunn*, 243 Kan. 414, 429, 758 P.2d 718 (1988).

Kaiser argues that K.S.A. 21-3205, which makes a defendant liable for reasonably foreseeable crimes, assumes that the defendant aided and abetted the initial crime charged in the complaint. He reasons that an intent to commit theft differs from first-degree felony murder, aggravated kidnapping, aggravated robbery, and unlawful use of a weapon, the crimes of which he was charged and convicted. This argument is unpersuasive. The defendant not only manifested an intent to steal a car, he intended to steal *the murder victim's car*. Under the facts, later set out, the jury was correctly instructed on aiding and abetting and found Kaiser was responsible for the other crimes committed because they were reasonably foreseeable.

### 3. Speculation, Conjecture, and Suspicion

The defendant next argues that his convictions were based on speculation, conjecture, and suspicion. The defendant concludes that the State relied on speculation and the stacking of inference upon inference to prove his intent to aid and abet Schaeffer in these crimes.

Kansas law does not permit a jury to find an element of a crime from inferences based only on inferences. In *State v. Burton*, 235 Kan. 472, Syl. ¶ 3, this court stated that presumptions and infer-

ences may be drawn only from facts established and presumption may not rest upon presumption or inference on inference. What is meant by this rule is that an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. After reviewing the evidence we find that any presumptions or inferences claimed by the defendant are either established facts or based on established facts. This claim has no merit.

## 4. The Evidence

Kaiser initiated the events by developing a plan with Schaeffer to steal a car. He knew Schaeffer was carrying a shotgun and shells. At times Kaiser had possession of the shotgun. When Schaeffer and the defendant observed Riley start his car, the defendant suggested taking that particular car. The defendant claimed he did not want to take a hostage, but the jury found this claim was not credible. The defendant accompanied Schaeffer in Riley's car after Schaeffer ordered Riley into the trunk of the car. The jury was also aware that Kaiser had several opportunities to report that Riley was in the trunk of the car. Kaiser was present when Schaeffer shot and killed Riley. The defendant's footprints were near the body. Both times Kaiser and Schaeffer stopped at Solis' house, the defendant exited the car but returned rather than leave Schaeffer.

Further, the defendant engaged the police in a foot chase after Schaeffer crashed Riley's car into a tree. After the car crashed, the defendant was in no danger from Schaeffer and could have then turned himself in to the police, but instead he ran away and hid in a car until he was found. In fact, the defendant had to be forced out of his hiding place by the use of a police dog. From these circumstances a reasonable factfinder could have determined that the defendant was a willing participant in the events despite his claim that he was an unwilling participant.

An appellate court will not reweigh the evidence or second-guess the jury's determination of the credibility of witnesses. After reviewing the record we find that there was sufficient evidence, viewing the evidence in the light most favorable to the State, upon

which a reasonable factfinder could conclude beyond a reasonable doubt that the defendant was guilty of these offenses.

### 5. Possession of Firearm

The defendant also claims the evidence did not show that he possessed the shotgun with intent to control and therefore was insufficient to sustain his conviction for unlawful use of a weapon. The defendant reasons that although he might have held the gun at times, Schaeffer was actually in control of the gun. The defendant cites *State v. Flinchpaugh*, 232 Kan. 831, 659 P.2d 208 (1983), where this court stated that possession of a controlled substance requires having control over the substance with knowledge of and the intent to have such control. 232 Kan. 831, Syl. ¶ 1.

The defendant's reliance on *Flinchpaugh* is misplaced. K.S.A. 21-4201(a)(7) makes it a crime to possess or carry "a shotgun with a barrel less than 18 inches in length or any other firearm designed to discharge or capable of discharging automatically more than once by a single function of the trigger." There is no requirement that the defendant intend to permanently possess, carry, or control the weapon. The defendant had the gun, knew what it was, and intended to possess it. There was sufficient evidence upon which a reasonable factfinder could convict the defendant of the unlawful use of a weapon based upon the instructions.

### WITHDRAWAL FROM CRIMINAL ACTIVITY

The defendant's next claim is that withdrawal is a defense to subsequent criminal activity of others. A defendant is entitled to have the jury instructed on his or her theory of defense even if the evidence supporting the defense is slight. *State v. Brown*, 258 Kan. 374, 386, 904 P.2d 985 (1995); *State v. Hunter*, 241 Kan. 629, 646, 740 P.2d 559 (1987). None of the crimes of which the defendant has been convicted contain a statutory defense of withdrawal. The question is whether Kansas recognizes withdrawal from criminal activity as a nonstatutory defense.

The defendant patterned his requested instruction on withdrawal after PIK Crim. 3d 55.04, which states: "It is a defense to a charge of conspiracy that the defendant in good faith withdrew from the agreement and communicated the fact of such withdrawal

to any party to the agreement before any party acted in furtherance of it." This instruction paraphrases K.S.A. 21-3302(b), which permits withdrawal from the conspiracy if the withdrawal occurred before any overt act in furtherance of the conspiracy was committed. The defendant sought to change the language "to a charge of conspiracy" and instruct that "[i]t is a defense that the defendant in good faith withdrew" based on an uncharged conspiracy to commit a felony theft of an automobile. Kaiser argues that the conspiracy ended when Kaiser communicated his withdrawal to Schaeffer. Kaiser reasons that if he cannot be charged with conspiracy to commit the subsequent crime, he cannot be convicted of the subsequent crimes.

The State argued that withdrawal is a statutory defense only to a charge of conspiracy and that the instruction was not required because the crime of conspiracy was not charged in the complaint. The trial judge refused to instruct the jury on a general defense of withdrawal.

In determining this issue, it is necessary to understand the distinction between liability for crimes of another, K.S.A. 21-3205, and the crime of conspiracy, 21-3302. Under K.S.A. 21-3205 an individual is criminally responsible for a crime committed by another if that individual aids, abets, advises, hires, counsels, or procures (aids and abets) the other to commit the crime. In addition, the individual is also statutorily liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by him or her as a probable consequence of committing or attempting to commit the crime intended.

The crime of conspiracy, K.S.A. 21-3302, is an agreement with another person to commit a crime or to assist to commit a crime. The crime of conspiracy has a penalty set by the legislature. In addition, the legislature provided that no person may be convicted of the crime of conspiracy unless an overt act in furtherance of the conspiracy is alleged or proved to have been committed by the individual or by a coconspirator. The legislature provided a defense to the crime of conspiracy if the accused voluntarily and in good faith withdraws from the conspiracy, and communicates the fact of such withdrawal to one or more of the coconspirators, before any

overt act in furtherance of the conspiracy has been committed by the accused or by a coconspirator.

As authority for his assertion that withdrawal is a valid defense to crimes of aiding and abetting, the defendant cites *United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992). In *Lothian*, the defendant was charged with and convicted of numerous counts of mail fraud, wire fraud, and interstate transportation of property obtained by fraud. The defendant and another person began an enterprise of soliciting investors in precious metals. The defendant participated in the scheme from May 1985 to December 1985, at which time he resigned to begin a new business venture. He rejoined the scheme after his new business failed. The defendant relied on a defense of withdrawal, claiming that he was not liable for crimes occurring during his absence.

The *Lothian* court recognized that withdrawal is traditionally a defense to crimes of complicity: conspiracy and aiding and abetting. Although Lothian was not charged with conspiracy or aiding and abetting, the court held the defense of withdrawal applicable under the facts of the case by finding that crimes of a mail or wire fraud scheme are akin to crimes of conspiracy. The court recognized that to withdraw from a crime of conspiracy, the defendant must either disavow the unlawful goal of the conspiracy; affirmatively act to defeat the purpose of the conspiracy; or take definite, decisive, and positive steps to show the defendant's disassociation from the conspiracy. 976 F.2d at 1261. Further, the court recognized that though a defendant is liable for substantive crimes committed in furtherance of a conspiracy, the defense of withdrawal from the conspiracy is also a defense to the underlying substantive offenses. 976 F.2d at 1262.

The *Lothian* court recognized that the defendant had not been charged with conspiracy. However, the court noted that mail and wire fraud are treated like conspiracy in several respects in that similar evidentiary and vicarious liability rules apply. The Ninth Circuit *Lothian* court noted that the Seventh Circuit had held withdrawal is not an available defense to substantive fraud charges, citing *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981), but the *Lothian* court distinguished *Read* on the facts because in *Read*

the withdrawal had no effect as the defendant had directed a key part of the scheme and the underlying substantive crimes were the inevitable consequences of the defendant's actions. In *Lothian*, conversely, the court held that the defendant's withdrawal negated the element of the use of the mails or wires where that use was not an inevitable consequence of the defendant's participation prior to withdrawal. 976 F.2d at 1263. Thus, the court held that withdrawal was a defense to substantive crimes which occurred after the defendant voluntarily and affirmatively ceased his participation in December 1985 and which the prosecution did not prove were the inevitable consequence of actions taken by the defendant or his co-schemers prior to his departure. 976 F.2d at 1264.

*Lothian* is distinguishable from the case at bar. Under the Model Penal Code withdrawal is included in the Code as a defense to aiding and abetting. See Model Penal Code §2.06(6)(c) (1962). Under K.S.A. 21-3302(b) withdrawal is a defense to conspiracy, but there is no statutory defense of withdrawal to aiding and abetting or other crimes. See K.S.A. 21-3205.

Kansas appellate courts have not recognized withdrawal as a common-law or court-created defense to aiding and abetting. The issue of withdrawal as a defense has twice been addressed. In *State v. Walters*, 8 Kan. App. 2d 237, 655 P.2d 947 (1982), *rev. denied* 232 Kan. 876 (1983), the defendant claimed he was entitled to an instruction on the defense of withdrawal based on evidence that he did not know the other participants were going to commit a crime when he drove them to the area where the crimes occurred and that he did not return later to pick them up. The *Walters* court stated:

"There are no Kansas cases directly in point. We do note Kansas 'borrowed' K.S.A. 21-3205 [the aiding and abetting statute] from Minnesota. Kansas did not adopt subdivision 3 of Minn. Stat. Ann. § 609.05 (West 1964), which provides a defense if the defendant abandons his purpose *and* makes a reasonable effort to prevent the commission of the crime prior to its commission." 8 Kan. App. 2d at 241.

The court concluded: "We express no opinion as to if, when or how one may withdraw from a crime and escape responsibility therefor,

as we are of the opinion the record in this case would not support an instruction concerning withdrawal." 8 Kan. App. 2d at 241-42.

The defense of withdrawal was recently addressed by this court in *State v. Pratt*, 255 Kan. 767, 876 P.2d 1390 (1994). The defendant actively participated with a co-participant in forcing two victims into an automobile. The defendant exited the vehicle because he was sick and/or he believed the co-participant was going to leave the state, which the defendant did not want to do. After the defendant exited the car, the co-participant attempted to rape one of the victims. The defendant contended he had withdrawn from the crime spree before the attempted rape occurred. Noting that the defendant cited no authority for his argument, the *Pratt* court said that *People v. Brown*, 26 Ill. 2d 308, 186 N.E.2d 321 (1962), had stated that withdrawal requires the communication of an intent to withdraw and that the withdrawal must be timely; *i.e.*, " 'it must be possible for the trier of fact "to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed." ' " 255 Kan. at 772. The *Pratt* court noted *Brown* stated that withdrawal may not be made effective from a felony murder when the transaction which leads to the felony murder has commenced. 255 Kan. at 772. The *Pratt* court, without acknowledging the defense of withdrawal, pointed out that the "[c]rimes [the defendant] had aided in starting in motion continued in his absence with the foreseeable result" and that there was no evidence the defendant exited the vehicle because he wanted no further involvement in the criminal activity. 255 Kan. at 773. The *Pratt* court concluded that an aider and abettor need not be physically present when the crime is committed and found that there was sufficient evidence to support the defendant's attempted rape conviction.

First, we note that all crimes in Kansas are statutory. K.S.A. 21-3102 states:

"(1) No conduct constitutes a crime against the state of Kansas unless it is made criminal in this code or in another statute of this state, but where a crime is denounced by any statute of this state, but not defined, the definition of such crime at common law shall be applied.

"(2) Unless expressly stated otherwise, or the context otherwise requires, the provisions of this code apply to crimes created by statute other than in this code."

In addition to statutorily defining the crimes, the legislature has set out the principles of criminal liability and specified the defenses to criminal liability. K.S.A. 21-3201 *et seq.* The specific defenses to criminal liability are not guilty; intoxication, K.S.A. 21-3208; compulsion, K.S.A. 21-3209; entrapment, K.S.A. 21-3210; and the use of force in defense of a person, dwelling, and property other than a dwelling. K.S.A. 21-3211, K.S.A. 21-3212 and K.S.A. 21-3213.

The Kansas Legislature has not enacted a defense of withdrawal from aiding and abetting. The trial court did not err in refusing to instruct the jury on withdrawal as a defense to the crimes of aggravated robbery, aggravated kidnapping, and felony murder.

## JUROR MISCONDUCT

The defendant filed a motion for a new trial based on the affidavit of one of the jurors, Eugenia Tunley. Tunley's affidavit stated that during jury deliberation she expressed her opinion to the other jurors that the defendant was not guilty of the charges. She stated that the other jurors made various statements as to her age (she was a teenager) and their desires to end the case quickly because of the upcoming holidays. Tunley's affidavit also stated that she was told by the jurors "the majority rules" and that she had to change her position and could not state to the judge that it was not her verdict when the jury was polled. Tunley stated that as 5 p.m. on the last day of deliberations and the Christmas holiday grew nearer, she was pressured to change her vote so the other jurors would not have to return. Tunley stated that she voted guilty against her belief because of the pressure and coercion of the other jurors. Tunley stated that she subsequently felt bad about her vote and informed the defendant and his attorney of the pressure which resulted in changing her vote to guilty.

The defendant contended that Tunley's verdict of guilty was the product of coercion by other jurors, and he filed a motion requesting that the trial court grant a new trial or recall the jurors for a hearing. The court refused to conduct an evidentiary hearing or

recall the jurors because the claimed error delved impermissibly into the mental process of the jurors, K.S.A. 60-441, and Tunley had individually agreed to Kaiser's guilt when the jury was polled.

A new trial will be granted only if required in the interest of justice. K.S.A. 22-3501(1). Juror misconduct is not grounds for a new trial unless it is shown to have substantially prejudiced the defendant's rights. *State v. Goseland*, 256 Kan. 729, 735, 887 P.2d 1109 (1994); *State v. Cady*, 248 Kan. 743, 756, 811 P.2d 1130 (1991).

The procedure for and limitations on challenging the validity of a jury verdict are statutory. K.S.A. 60-444(a) states that a juror is not exempt "from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict . . ., except as expressly limited by K.S.A. 60-441." K.S.A. 60-441 prohibits testimony concerning the mental processes of the jury: "Upon an inquiry as to the validity of a verdict . . . no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict . . . or concerning the mental processes by which it was determined."

Both K.S.A. 60-444(a) and K.S.A. 60-441 are implicated here. The information in Tunley's affidavit concerning the statements made by other jurors is objective material about which testimony may be taken under K.S.A. 60-444(a) without controverting K.S.A. 60-441. The question is whether the information in Tunley's affidavit and the effect these statements had on her verdict were prohibited by K.S.A. 60-441.

To support his claim that the jury's verdict could be challenged, the defendant relies on *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1992). In *Saucedo*, a medical malpractice case, two instances of alleged jury misconduct occurred. A juror informed the other jurors during deliberations that the plaintiff's son could speak Spanish though he testified that he could not, and a juror stated that the uncle of the plaintiff's deceased husband was a cocaine dealer and that it was possible the deceased died of a cocaine overdose. Based on the affidavits of three jurors admitting the miscon-

duct, plaintiff filed a motion to recall the jury. This court agreed with the trial judge that juror misconduct did occur during deliberations. 252 Kan. at 727-28. This court held that the misconduct substantially affected the right of the plaintiff to a fair trial because a juror introduced evidence on material issues of fact and remanded the case for a new trial. 252 Kan. at 733.

The defendant stresses the following language from *Saucedo*, 252 Kan. at 732:

"A review of the Kansas cases cited indicates the statutory prohibition against receipt of evidence to impeach a jury verdict by showing the mental process by which the verdict was determined does not apply where a party claims the constitutional right to a trial by jury has been violated by jury misconduct which has a substantial effect on the rights of that party."

The defendant reasons that this statement permits jurors to testify concerning the mental processes by which the verdict was reached.

The fallacy in the defendant's argument is that he ignores the concluding sentence of the quoted paragraph: "When the jury is recalled, a juror may be questioned or evidence received as to physical facts, conditions, or occurrences of a juror's misconduct, either within or without the jury room, which were material to the issues being determined." 252 Kan. at 732. This statement does no more than restate K.S.A. 60-444(a) concerning what testimony of jurors is admissible. Earlier in the opinion, the *Saucedo* court explicitly adhered to the prohibition of K.S.A. 60-441 against testimony concerning the effect of statements or events as influencing a juror to agree to the verdict or the mental processes by which the verdict was determined. 252 Kan. at 728. The court stated that a verdict may not be impeached by questions concerning a juror's views or conclusions, the reasons for those views or the factors used in determining those conclusions, or what influences those views or the mental process in reaching such conclusions. 252 Kan. at 728-29. The court concluded: "Public policy forbids the questioning of a juror on these matters for a very obvious reason, *i.e.*, there is no possible way to test the truth or veracity of the answers." 252 Kan. at 729.

Here, the jury was instructed:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty." Instruction No. 9.

"When you retire to the jury room you will first select one of your members as foreman. He or she will preside over your deliberations, will speak for the jury in court, and will sign the verdict upon which you agree.

"Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions.

"Your agreement upon the verdict must be unanimous." Instruction No. 16.

The jury was polled after the verdict was returned. Tunley responded: "Yes, it is," when asked whether the verdict read by the court was her verdict.

In *Crowley v. Ottken*, 224 Kan. 27, 31, 578 P.2d 689 (1978), this court stated that "the mere fact a juror who joins in a verdict later professes to believe the defendant innocent is no basis for ordering a mistrial." See *State v. Mitchell*, 234 Kan. 185, 191, 672 P.2d 1 (1983). The motion for a new trial here relates to Tunley's mental process in determining the verdict and is prohibited by K.S.A. 60-441. Tunley agreed to the verdict, and her subsequent claim that she believed the defendant was innocent is not a basis for ordering a new trial now. Based upon the circumstances of this case, the trial court properly denied the defendant's motion without recalling the other jurors.

## PROSECUTION AS AN ADULT

The defendant next claims that the court erred in certifying him for prosecution as an adult.

The court may authorize prosecution as an adult of a juvenile who is 16 years old at the time of the offense if there is substantial evidence that the juvenile should be prosecuted as an adult. K.S.A. 38-1636(f)(3). The defendant was 17 years old at the time of these offenses, less than 3 months from his 18th birthday. The State filed a motion to waive juvenile jurisdiction pursuant to K.S.A. 38-1636.

K.S.A. 38-1636(e) sets forth eight factors which shall be considered in determining whether a juvenile should be prosecuted as an adult:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant under the Kansas juvenile code or a juvenile offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution."

K.S.A. 38-1636(e) further states that "[t]he insufficiency of evidence pertaining to any one or more of the factors listed in this subsection shall not in and of itself be determinative of the issue." Our standard of·review is whether there is substantial evidence supporting the trial court's decision. See K.S.A. 38-1636(f)(3); *State v. Tran*, 252 Kan. 494, 508, 847 P.2d 680 (1993).

The trial court held an extensive hearing on the State's motion to waive juvenile jurisdiction. We note that the defendant's attorney had been granted leave to arrange a psychological evaluation of the defendant for purposes of the waiver hearing. When he was unable to make arrangements for a qualified individual to evaluate Kaiser, the court ordered that Kaiser's evaluation be conducted by Dr. William Logan, whom the State had selected for its evaluation. The defendant's attorney did not object. The State called Dr. Logan to testify.

Dr. Logan testified that he evaluated the defendant. In reaching his conclusions, he relied on statements the defendant made to him when interviewed and on psychological and other records

completed at the defendant's various placements, including the Youth Center at Beloit, Phillipsburg Middle School, St. John's Military Academy, Topeka State Hospital Screening Unit, the Youth Center at Atchison, and the Youth Center at Topeka (YCAT). Dr. Logan also considered police reports concerning the current offenses. Dr. Logan testified as to events the defendant self-reported.

Dr. Logan testified that the reports he reviewed generally confirmed the defendant's self-report, with the additional information of an incident of sexual abuse. He testified as to the results of psychological testing conducted by various agencies and as to the defendant's placements and the recommendations which led to those placements.

Based on his evaluation of the defendant, Dr. Logan diagnosed conduct disorder, group type, a disorder generally given to juveniles who engage in misbehavior, generally with peers, and an attention deficit, hyperactivity disorder based on the defendant's history. Dr. Logan testified that the attention deficit disorder and hyperactivity created some personality deficits but would not necessarily affect the defendant's capacity to be rehabilitated. Dr. Logan indicated that the defendant's prior placements in programs did not result in a long-term benefit because he routinely had eloped from programs with less structure. He noted that the defendant had made some improvement while at YCAT, but deteriorated when the structure of the program lessened, and he noted that the defendant's longest placement had been for 6 or 7 months. Dr. Logan opined that the juvenile system in Kansas may have the capacity to provide the needed programs for the defendant, but historically the juvenile system has not provided it.

Dr. Logan opined that because of the defendant's immaturity, the defendant required consistency in a placement over a period of several, at least 2, years; the defendant would also need consistent counseling, several times a week, by someone experienced in dealing with individuals like him. Dr. Logan felt it was possible that a placement until the age of 21 (around 2½ years) could facilitate changes in the defendant "if he applied himself consistently, if he stayed in one facility, if he didn't elope, if he made some conscious effort to avoid peers that were engaged in trouble." Dr. Logan

noted, however, that the defendant had not made such an effort in the past, though his current experiences might have changed him.

The State also presented the testimony of Dorothy Lewis, a social worker with the Department of Social and Rehabilitation Services (SRS). Ms. Lewis testified that she has been the defendant's primary social worker since May 1987. She was familiar with his various placements and testified as to the reasons he was removed from various placements, including that he had completed the programs or purpose of the placement or that he had eloped from the facilities. The defendant's counsel objected to this testimony due to hearsay and lack of foundation for the witness' personal knowledge. The court noted that Ms. Lewis testified she had personal knowledge and indicated that the defendant's counsel could inquire further on the basis for Ms. Lewis' personal knowledge, which might affect the weight of Ms. Lewis' testimony. The objection was made continuing. The defendant's counsel also objected to testimony by Ms. Lewis concerning offenses, such as theft, which led to the defendant's placements. The court overruled the objection based on the business records exception to the prohibition against hearsay. Ms. Lewis stated that she had made every effort available to her and her agency to rehabilitate the defendant. She testified that the only placement possible would be to attempt a referral to YCAT because no group home would accept the defendant and that she did not know of any program that could provide extensive counseling treatment.

On cross-examination, the defendant's attorney questioned Ms. Lewis as to the basis of her personal knowledge of the defendant's various placements. She testified that her knowledge was based on various telephone contacts with the administrators at the various facilities and on written progress and discharge reports prepared by the facilities. She did not know who at the facilities had prepared some of the reports; for some facilities she did know who had prepared the reports but did not know how the reports were compiled. Following this testimony, the defendant's counsel renewed his objection on the basis of hearsay and requested that the court strike the testimony of Ms. Lewis. Counsel noted that the require-

ments for admitting business records had not been satisfied and that business records had not been offered into evidence or admitted. The judge overruled defendant's objection to the social worker's testimony and stated that it would give whatever probative value it deemed necessary or appropriate to the evidence.

Finally, the State presented the testimony of Dr. Leo Herrman, the program director at YCAT. Dr. Herrman testified that if the defendant were returned to YCAT, he would be exposed to the full array of rehabilitation programs available but that YCAT did not have anything to offer the defendant that the facility had not already offered him. Dr. Herrman also stated that YCAT was able to provide individual counseling but not extensive counseling (several times a week) by a therapist uninvolved in making management decisions about the defendant. Dr. Herrman pointed out that the treatment team would determine the appropriate program for the defendant if placed in YCAT. If placed at YCAT the team could recommend thrice-weekly individual psychotherapy, though Dr. Herrman doubted that recommendation would be made because intensive psychotherapy with conduct disorder has a very poor prognosis.

In addition to the testimony, two journal entries of prior adjudications of the defendant were admitted into evidence: a September 15, 1989, adjudication for misdemeanor theft of property and an April 23, 1991, adjudication for felony theft of property and misdemeanor battery.

After the evidence had been submitted, the court discussed the factors specified in K.S.A. 38-1636(e) noting:

(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult: The court noted that the allegations against the defendant were of significant and serious magnitude.

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner: The court noted that the allegations against the defendant indicated aggressive, violent, and premeditated actions. (The court noted that determining whether

the defendant was an aider and abettor in the crimes was not the purpose of the hearing.)

(3) Whether the offense was against a person or against property: The court noted that the offenses were both against a person and against property, and the offense resulted in the death of a person.

(4) The number of offenses unadjudicated and pending: The court stated that the current complaint included four unadjudicated and pending charges.

(5) The previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence: The court noted prior adjudications for both felony and misdemeanor theft and for battery. Further, the testimony of Dr. Logan and his findings reflected a pattern of aggression by the defendant.

(6) The sophistication or maturing of the respondent as determined by the respondent's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult: The court opined that this was a difficult category for this defendant. The court noted that the defendant had been a ward of the State for some time and that the State had failed to meet his needs and had not done a good job of providing the appropriate resources to meet the needs of the defendant. The court also questioned the sophistication and maturity of the defendant.

(7) Whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under the juvenile code: The court noted that it could commit the defendant to a youth center until the age of 21 but that even if all things were at the optimum, the program "may" benefit the defendant, with no guarantees and not even a likelihood of benefit.

(8) Whether the interests of the defendant or of the community would be better served by criminal prosecution: The court noted

that while the defendant's position was that he would not be better served by criminal prosecution, the community would be better served by criminal prosecution.

Based on the totality of the circumstances, the court determined that the system had failed the defendant and that it did not have the capability at this point in time to rectify the prior mistakes made. The court further found that even if Dr. Logan's recommendation for intensive psychotherapy were followed, the State lacked the resources to implement such a program for the defendant. The court granted the State's motion to waive juvenile jurisdiction and certified the defendant for prosecution as an adult.

On appeal, the defendant raises three challenges to the court's certification for adult prosecution.

### 1. Hearsay

First, the defendant complains that the court considered hearsay evidence in making its decision. The defendant points out that hearsay evidence is inadmissible in juvenile proceedings unless the evidence meets a specific hearsay exception under K.S.A. 60-460. See *In the Matter of Mary P.*, 237 Kan. 456, 459, 701 P.2d 681 (1985). K.S.A. 38-1636(e) states that subject to the provisions of K.S.A. 38-1653, written reports and other materials relating to the respondent's mental, physical, educational, and social history may be considered by the court. K.S.A. 38-1653 provides that the civil rules of evidence apply in all adjudicatory hearings and states that "[t]he judge presiding at the hearing shall not consider, read or rely upon any report not properly admitted according to rules of evidence."

The defendant complains that the court permitted Ms. Lewis to testify concerning the defendant's placements, his behavior, and the treatment decisions of the various facilities based on telephone contacts and sporadic reports from some of the facilities. The defendant points out that no records or reports were offered into the record as business records. The defendant argues that the business records exception did not apply to Ms. Lewis' testimony. The defendant claims this violated his right to a fair proceeding and to cross-examine witnesses.

K.S.A. 60-460(m) states that writings offered are admissible "if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." The defendant asserts there was no showing that the reports used by the social worker were made in the regular course of business at or about the time of the act or condition reported or that the source preparing the reports and the method and circumstances of preparation indicated trustworthiness. The defendant stresses that Ms. Lewis was permitted to testify concerning the defendant's "patterns" and her determination based on personal knowledge that SRS had done all it could and because SRS had no programs to offer the defendant, the only possible placement for him was YCAT.

The defendant is attempting to exclude the testimony of the primary social worker responsible for monitoring and supervising him while in SRS custody by focusing on the records and information used by the social worker to evaluate the defendant's progress and the failures within the system. Even though the information used by the social worker was made in the regular course of business, the records were not being offered as memoranda or records of acts, conditions, or events to prove facts. Records may be used to refresh a witness' recollection or memory even though the records were not prepared by the witness and even though the records are not admitted into evidence. See *State v. Kelly*, 19 Kan. App. 2d 625, Syl. ¶¶ 1, 2, 3, 874 P.2d 1208 (1994). Here, the records and information were used not to refresh Ms. Lewis' memory while testifying but to show what information she had used to determine what programs and placements would be most beneficial to the defendant. It is the social worker's conclusion and acts based on the information that are in question.

The records were available for the defendant to question. The social worker testified as to her actions and why she acted and was cross-examined by the defendant. The same rationale applies to Dr. Herrman's testimony. The testimony of the social worker and

the director of YCAT was not in violation of K.S.A. 38-1653, which prohibits the admission of hearsay testimony.

The defendant also complains that Dr. Logan's testimony was based on reports and not on facts personally perceived by him. Although the defendant admits that some of Dr. Logan's information came from the defendant, the defendant asserts that "much" of the evaluation was based on the reports. After acknowledging that under the rules of evidence, an expert witness is allowed to state an opinion and the reasons therefore without first specifying the data upon which the opinion is based, the defendant stresses that "upon cross-examination the witness may be required to specify such data." K.S.A. 60-458.

Dr. Logan adequately specified the data upon which his evaluation has based. His reliance on information prepared by other sources was appropriate. When an expert witness is required to specify the data upon which the expert opinion is based, and that data includes statements made by a criminal defendant during a psychiatric evaluation, the defendant's statements are not offered to prove the truth of the matter asserted and thus are not hearsay. Rather, the defendant's statements are part of the data perceived by or made known to the expert and meet the admissibility requirements of K.S.A. 60-456(b). *State v. Humphrey*, 252 Kan. 6, Syl. ¶ 5, 845 P.2d 592 (1992). The same is true for data obtained from other sources. The reports upon which Dr. Logan's expert opinion was based were not offered into evidence and were not inadmissible hearsay.

### 2. Custody Beyond Age 21

The defendant claims that in evaluating factor (7), the judge failed to consider that a juvenile could be retained in custody beyond the age of 21. Factor (7) requires the court to consider whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction.

K.S.A. 38-1675 states that when a juvenile offender reaches the age of 21, the juvenile shall be discharged from any further obligation under the commitment. However, the defendant cites

K.S.A. 38-1676, which provides that if a juvenile offender has committed an act which would be a class A or B felony if committed by an adult, the county attorney and the court must be notified 30 days before the offender's release. The county attorney or the court on its own motion may request a hearing to determine if the juvenile should be retained in the custody of the Secretary of SRS. "Following the hearing if the court authorizes a dispositional order for the secretary to retain custody, the juvenile offender shall not be held in a state youth center for longer than the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which the juvenile offender has been adjudicated to have committed." K.S.A. 38-1676(b).

In its evaluation of factor (7), the court mentioned that it could commit the defendant to a youth center until discharged according to law or until the age of 21. The court did not discuss whether K.S.A. 38-1676 would, at the time of defendant's prospective release from custody, permit the court to authorize continuing custody of the defendant.

However, as the State points out and contrary to the defendant's assertions, the court's evaluation of factor (7) turned not on the length of the defendant's potential juvenile placement but rather on the lack of resources to rehabilitate the defendant in the juvenile system. The court recognized that the system had failed the defendant in the past and that even in optimum conditions the possibility of rehabilitation was not guaranteed or even likely. The fact that the court misstated the potential for continuing custody beyond the age of 21 does not require reversal of the court's decision to waive juvenile jurisdiction.

### 3. Weighing the Factors

Finally, the defendant claims that the court's decision to certify him for prosecution as an adult was not based on substantial competent evidence. As stated earlier, "[t]he insufficiency of evidence pertaining to any one or more of the factors listed in this subsection shall not in and of itself be determinative of the issue." K.S.A. 38-1636(e). Our standard of review is whether there is substantial evidence supporting the trial court's decision. See K.S.A. 38-

1636(f)(3); *State v. Tran*, 252 Kan. 494, 508, 847 P.2d 680 (1993). Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *State v. Ratley*, 253 Kan. 394, 398, 855 P.2d 943 (1993).

A review of the evidence admitted at the waiver hearing reveals substantial evidence upon which a reasonable person could conclude that the defendant should be certified for prosecution as an adult. Although some evidence could be construed against adult certification, an appellate court will not reweigh the evidence. The court did not err in waiving juvenile jurisdiction and allowing the defendant to be prosecuted as an adult.

## DOUBLE JEOPARDY

Finally, the defendant claims that the imposition of consecutive sentences for his convictions of first-degree murder and the underlying felony of aggravated robbery violates the prohibition against double jeopardy.

The defendant acknowledges that it is the well-established law in Kansas that multiple convictions and punishments for both felony murder and the underlying felony are not a violation of double jeopardy. See, *e.g.*, *State v. Gonzales*, 245 Kan. 691, 702-07, 783 P.2d 1239 (1989); *State v. Dunn*, 243 Kan. 414, 431-33, 758 P.2d 718 (1988). Although the defendant contends that these cases were incorrectly decided, he makes no argument as to why the decisions were incorrect except to state that felony murder is not excepted from the principles of double jeopardy.

The defendant has shown no compelling reason for us to depart from this well-established law and find that these cases were wrongly decided. There was no double jeopardy violation here.

Affirmed.